Milligan, J.,
delivered the opinion of the Court.
This is a hill filed in the Chancery Court at Shel-hyville, in 1859, for the emancipation of George Porter, Jr., Martha Porter and Jane Bell Porter, persons, of color, by their mother and next friend, Rose Porter, a free woman of color.
The facts of this case are peculiar, and singularly illustrative of the character of the institution of slavery as it once existed in this State. It appears from the record, that George Porter, Sen., the father of complainants', and husband of their next friend, was once the slave of John N. Porter, and that, by his industry and fidelity, he so won the affections of his master, that he granted him the privilege of purchasing his own freedom, at a price greatly below his actual value. After his own freedom was secured, through industry and economy, he purchased his wife, with whom he had, for many years, lived and cohabited, as husband and wife, in a state of bondage,' and by whom he had six children born during the bondage of the mother, whose legal status followed hem. He emancipated his wife, and they were afterwards lawfully married, and began life anew. They were prosperous, and attained to a reputation for industry and integrity, in the community where they resided, of which the most favored of the race might well be proud. Their great struggle appears to have been to *558 procure tbe means necessary to purchase and emancipate their children, still remaining in servitude.
One after another, of the elder children were purchased and set free; but, before the desired object was fully accomplished, John N. Porter gave the complainants to Thomas N. Porter, who held them as slaves; but, in kindness and sympathy for a father struggling to redeem his own children . from bondage, he permitted them to remain with their parents, and repeatedly declared his purpose never to separate the family, and as soon as the father was able to purchase them, to allow him to do so. The parties remained for some time in this condition, and Thomas N. Porter died, leaving no Will, and liabilities beyond his personal estate to pay. Administration was granted on his estate, and it was found necessary to resort to his slaves to pay the debts.
After consultation with the widow of the deceased, the complainants were selected . to be sold, to raise the means necessary to pay off the debts of the estate, and to secure it against loss, on account of the condition in which the complainants were then living. All the necessary steps were taken to obtain an order of Court to sell complainants; and in the petition for the sale, it is alleged, as one ground upon which the sale should be ordered, that complainants’ father “was a prudent and discreet money-making negro, and that he had bought himself, and then his wife and some of. his children, and claimed to have contracted, at $1,800 dollars, for the purchase and freedom of his other children,” and on that account, it would be for the manifest interest of the estate they should be sold.
*559 Under tbis state of facts, the sale of complainants was ordered, and they were afterwards, at public outcry, sold, and purchased by the father, George Porter, Sen. Sixty dollars of the purchase money was paid in hand, and a note, with security, given for the remainder, |990.
George Porter, Sen,, had several children after the emancipation of his wife, which, together with those he had, by purchase, rescued from bondage, made a large and expensive family. His means were limited, and all dependent upon his own industry and enterprise for support. One of the complainants, George, became dissipated and worthless, and added greatly to the old man’s difficulties. His debts pressed ' heavily upon him, and year after year, he became more and more embarrassed. His friends sympathized with him, and one of them, Blakemore, loaned him the use of his name and credit, by which he raised the means necessary to pay for his children, which were promptly applied to that purpose, and the debt fully discharged. But still he was bound to Blakemore, and others, who had assisted him, and anxious to pay them. He often spoke of his embarrassments, and at times, while speaking of them, was moved to tears, and declared his purpose, rather than his creditors should suffer, to sell his own children; and in his extreme difficulties, did actually convey his son George, in trust, to secure his creditors.
But in the midst of his pecuniary difficulties, a more insuperable embarrassment intervened. His health gave way, and after a protracted illness, he died, without *560 having emancipated his children, or leaving a Will behind him. The defendant, Blakemore, being a large creditor, - administered on his estate, which was found, without holding complainants as his slaves and property, to he hopelessly insolvent. Judgments had been taken against the old man in his lifetime, and after his death, executions were issued and levied on G-eorge and Martha, two of the complainants, and they were confined in the county jail, to await a sale under execution.
Under this state of facts, this bill was filed, setting up the rights of the complainants to their freedom, under the agreement of their father with Thomas N. Porter in his lifetime, which was, as' it is insisted, after their purchase by their father again by him, confirmed by a parol promise and agreement to complainants; and praying that, by attachment, they be taken into custody and hired out by the Master, or restored to their mother, until their rights could be declared.
The answer of the administrator, and other creditors, who are made parties, either denies the essential allegations in the bill, or insists on their proof. It is admitted that G-eorge Porter, Sen., had purchased and fully paid for complainants, but it denies that he ever made to complainants any agreement or promise of their freedom, which a court of equity would enforce, and insists that complainants are properly assets in the hands of their father’s administrator, which may lawfully be applied to the payment of his debts.
The Chancellor dismissed the bill, and ordered complainants to be delivered up to the administrators, *561 to be subjected to tbe payment of the father’s debts. Erom 'which an appeal in error is prosecuted to this Court.
Since the appeal in this case, the war, of which this Court is bound to take judicial notice as a great historic fact, has intervened, and the people, by an amendment to the Constitution of the State, has settled forever, the rights of the complainants. They' now need no reversal of the- Chancellor’s decree, to-save them from the hands of the administrator, or to perfect the cherished purpose- of the life of their father. They are free by the fiat of the nation, ratified and confirmed by the people of the State.
The decree of the Chancellor need not, therefore,, be reviewed, except so far as it is necessary to the adjudication of costs in this cause. And the only question in this class of cases that is now open in Tennessee, for discussion, is, really a question of fact. The law, by a series of well considered and unbroken decisions, is well' settled. In this State it is clear,, before the abolition of slavery by the adoption of the-amended Constitution, that the master could not emancipate his slave without the consent of the State;. But it is equally clear, on well settled principles, as well at common law as by the current of our own adjudications, that the owner can part with his right to property in his slaves, and thereby vest them with an inchoate right to freedom. “This may be done,”' says this Court in the case of Lewis vs. Limanlan, 8 Hum., 185, “by deed, or Will, or even by parol contract with the slave; and if, in either of these *562 modes, the master has parted with his right, nothing remains to be done to entitle the slave to his freedom, but the assent of the government. But, although the right of the slave to freedom is imperfect and .incomplete until the assent of the State has been manifested by the proper tribunal constituted by law, and intrusted with the discretionary power of giving such assent, yet the legal character and condition of the slave, is changed. His relations to. his former master, and to the community, are likewise changed. By the act of the master, imparting to him an imperfect right to freedom, he ceases to be in a state and condition of slavery — ceases to have an owner or master, within the meaning of the law.”
In the case of Lewis et al. vs. Daniel, Administrator, 10 Hum., 305, which arose on the construction of a Will that directed the emancipation of certain slaves, .on the condition that they were, by law, permitted to (remain in the State; and if they were not, by law, per-ohitted to remain in the State, free, then they were directed absolutely to Daniel, the executor. In this case, •Judge Turley, in delivering the opinion of the Court, said: “We have heretofore held that a devise of freedom was a substantial thmg, whether it be recognized ¡by the State or not, and that no one but the State can interfere in relation thereto.” Upon what principle, then, can the executor devisee object to this emancipation, unless it be that the emancipation cannot be «effected by law ? The slaves have acquired a right to their freedom inchoate, and they have.the right to ask the protection of the law therefor, as far as 'it is given. *563 They are not to be estopped by the fact that the donor, in a different clause of his Will, has devised them to the executor, if they cannot be emancipated so as to remain in the State. If they choose to go out of it, what right has the executor devisee, to complain? Hone, in our estimation, whatever.
The same principle was again recognised in the case of Laura Jane us. Hagan, Administrator, 10 Hum., 332, and all the cases reviewed and approved in still a later case, reported in 1 Sneed, Boon vs. Lancaster, next friend, etc., 578. The principle in all • these cases is well settled, that the owner of a slave may part with •his right of property in his slave by deed, by Will, or even by parol contract, when it is established by clear and satisfactory proof that the master or owner has voluntarily entered into it. The right is a vested one; and although the assent of the State is necessary to perfect it, no one but the State can take advantage of it, not even the owner or master, after the right is once vested. A Court of Chancery, if the right is once vested, will interfere, to prevent its defeat: Elias et al. vs. Smith et al., 6 Hum., 33.
In this case, there can be' no doubt of the existence of a parol agreement between Thomas N. Porter, in his lifetime, and the complainant’s father, George Porter, Sen., that he was to have the privilege of purchasing his children, for the purpose of emancipating them; and although Thomas N. Porter died before this agreement was fully consummated, it is clear, from all the facts and circumstances attendant on the administrator’s sale, at which George Porter, Sen,, formally bought his chil" *564 dren, that the distributees and bystanders looked upon it as a purchase of his children’s freedom. The price paid was greatly below their market value, and the father had for years previous, been struggling to achieve this very object. It was the leading purpose of his life, and the community, sympathizing with him, as it appears from the bidding at the sale, were willing to see him accomplish it on the cheapest terms possible. True, afterwards, in his extreme embarrassments, which seem to have followed him from this very purchase, and his great solicitude to reform his dissipated son, George, he, on more than one occasion, proposed to sell George; and did finally convey him, with other property, in trust, to secure the payment of his debts. But, in his various conversations with his attorney, and the witness in this cause, he always opposed the removal of George, South, and expressed a hope that he would reform, and an earnest desire that his reformation should be effected at home, where he would be under his control.
The whole record is so pregnant with facts and circumstances, going to establish the settled purpose of the father to emancipate complainants, and that they so understood it, that it is impossible to resist the conclusion, that there was, to this effect, a distinct understanding, if not an agreement in terms, between the parties. The purpose of the father thus clearly appearing, a Court of Chancery will make every presumption in favor of human freedom, and look at the real substance of things — at the very purpose and intention of the parties — and will not suffer mere legal forms and technicalities, or the dress and drapery of transactions, to *565 baffle the ends aimed at. We conclude, therefore, on the ■whole case, that the Administrator had no control over the complainants, or the proceeds of their hire; and that neither the one oy the other, was subject to administration.
The decree of the Chancellor dismissing the bill will be reversed, with all the costs of this cause; and the cause remanded, for an account of the hire of complainants.